PLAINTIFF'S EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN DOE and JANE DOE | : | Case No. |
| Plaintiffs, | : | Judge |
| | : | Magistrate Judge |
| v. | : | |
| JAMES HAAS, et. al, | : | |
| | : | |
| Defendants. | : | |

### DECLARATION OF JANE DOE

I, Jane Doe, being of sound mind and with personal knowledge of the facts, do hereby make this declaration under penalty of perjury, pursuant to 28 U.S.C. 1746(2), this 28th day of February, 2012:

1. I am 41-years-old. When I was sixteen, I started dating Mr. Doe, and we got married when we were twenty-one. We have been married for twenty years. Mr. Doe and I have four children; three boys aged seventeen, thirteen, and eight, and a fifteen-year-old daughter.

2. I currently live in the marital home of my family with my four children and Mr. Doe's parents in Hebron, Ohio, which is located in Licking County. My husband and I have owned the home for the past ten years.

3. Faith is very important to our family and has kept our family together through these extremely challenging times. We resolved to keep our marriage strong during my husband's incarceration.

4. During his incarceration, the children and I visited him twice per month, the maximum number of family visits allowed under prison rules. Additionally, we spoke with him and wrote to Mr. Doe nearly every evening over the seven years.

5. During his nightly calls home, Mr. Doe would talk with his children about their progress in school and about other areas of their lives. Sometimes, he would referee disputes between them or would mediate when the children disagreed with me. In his calls to his children and in the letters he wrote to them, Mr. Doe always expressed his love for them and offered words of parental advice, wisdom, and encouragement.

6. The children and I looked forward to these visits and calls, and missed their father terribly during the incarceration. The children and I eagerly awaited his return home upon his release.

7. After Mr. Doe completed the departure paperwork, Defendant Haas visited the house. During the visit, Defendant Mr. Haas indicated the home was too close to a school and could not be approved as a residence for my husband while on PRC. Defendant Haas explained that Ohio law forbids people who have been convicted of sex offenses from living within one thousand feet of schools.

8. In reality, our home is located more than 1,000 feet from a school. Eventually Defendant Haas realized that the information he had about the home's address and distance from a school was wrong but still denied approval.

9. This time the denial was based on the presence of minors, our own children.

10. When I explained that Mr. Doe's charges did not involve our children, Defendant Haas suggested that I speak with Defendant Jackie Webb, the Adult Parole Authorities sex offender specialist.

11. I called Defendant Webb, and while she conceded that there was no law prohibiting Mr. Doe from residing with his minor children, she said that the approval of Mr. Doe's address was left to the discretion of the probation officer.

12. Shortly after this discussion, I called Defendant Haas again, and he informed me that if Mr. Doe didn't provide an acceptable alternative address, he would have him shipped to Cleveland or Cincinnati for PRC supervision.

13. In November 2011, Defendant Haas called me to discuss the issue of Mr. Doe's residence. During the call I explained that the family home had once been a duplex and that we would be willing to convert it back to provide a separate residence for my husband. Defendant Haas said that his supervisor, Defendant Manz, would not allow Mr. Doe to live in a duplex connected to the home where our children lived.

14. Defendant Haas then issued a warning that if Mr. Doe did not submit a suitable address, Defendant Haas might have to "put him under a bridge." I then made an arrangement with a family friend for my husband to reside temporarily in a vacant home the friend owns in Newark, Ohio.

15. Our family has been torn apart as a result of Mr. Doe's absence. The children miss their father and are experiencing anxiety. Seeing their father in church is particularly tough for the children, as they cannot touch, hug, or talk to him. Essentially, their father is a ghost in their midst.

16. At times the children have become resentful of me and others who are able to visit with their father.

17. Since Mr. Doe's release, I have been forced to choose between spending time with my husband at the Newark address, and devoting attention to my children at the Hebron address. I feel guilty spending nights away from the kids, so I only spend a night or two per

week at Mr. Doe's house. Additionally I feel guilty that the kids don't get to spend time with or speak with their father.

18. These divisions and resentments are straining our family and our marriage, and I fear they could permanently destroy both.

19. Right before Lonny's release, someone sent an anonymous letter to the Licking County Children's Services falsely accusing him of sexually abusing our daughter. A representative from Children's Services and an officer from the Licking County Sheriff's Department interviewed our daughter at school. After the interview, they concluded the allegation was false.

20. Mr. Doe's criminal proceedings were extensively covered by the media. This intense media coverage almost destroyed our family, especially our children. I need to proceed as a Jane Doe to protect my children and me from any more media coverage. I fear that additional media coverage could result in physical harm to Mr. Doe, my children, or me, especially after the false anonymous letter was sent.

**I declare under penalty of perjury that the foregoing is true and correct.**

_Jane Doe_
Jane Doe