*Lifepoint Solutions*

## SEX OFFENDER EVALUATION

Name: █████████                                    Case #: █████

### Sources of Data:

Mr. ███████ was interviewed at Lifepoint Solutions on March 8, 2012, and was interviewed over the telephone on March 12, 2012. Additional data was provided by Ms. Margie Slagle, Attorney, Ohio Justice and Policy Center, including an Ohio Bureau of Criminal Identification and investigation investigative report, a Ohio Department of Rehabilitation and Correction Reentry Accountability Plan, a transcript of a recorded telephone conversation between Mr. ███████ and one of his victims ███████, a copy of Mr. ███████'s indictment, a copy of Mr. ███████'s sentence hearing, a copy of Mr. ███████'s judgment entry, examinations and interviews of both victims from the Licking County Children's Services, a report from the Licking County Sheriff's Office/Detective ███████ and risk assessments from the Ohio DRC including a Static 99 and a risk/needs assessment. Additional information was provided during telephone interviews of Ms. Angelika Manz, Unit Supervisor Columbus region 5, Ms. ███████, Mr. ███████'s wife, and Mr. ███████ Sr., Mr. ███████'s father.

To evaluate Mr. ███████'s risk to re-offend, he was scored on the STABLE 2007 and the Static 99; two sex offender risk assessment instruments. The purpose of the evaluation, and the non-confidential nature of the assessment were explained to Mr. ███████ and he signed the appropriate release of information forms.

### Identifying Information:

Mr. ███████ is a forty-one year old, married (married one time), Caucasian male, who was referred by Ms. Margie Slagle, attorney, Ohio Justice and Policy Center, for a sex offender risk assessment evaluation, specifically whether Mr. ███████'s four children would be at risk to be sexually assaulted if he is permitted to reside with his family.

Mr. ███████ was charged with one count of rape and six counts of unlawful sexual conduct with a minor, and three counts of sexual imposition, with two female, adolescent victims. Their ages were described as being between thirteen and fifteen years old and sixteen years old. The victims were sisters who used to attend the ███████████████ The victims also baby-sat for Mr. ███████'s four children, when they were between the ages of one through nine years old.

According to police records, Mr. ███████'s semen, confirmed by DNA evidence was found in the hallway of the church and in his car. Mr. ███████ was convicted of raping the older of the two victims one time and engaging in unlawful sexual conduct with a minor with the fifteen year old victim, over a period of approximately eighteen months. It should be noted that the older victim ███ recanted her accusations in a note to the deputy sheriff who worked at the victims' high school. She later changed her story and said the offense did occur.

Mr. ███████ accepted a plea bargain and was given a seven year prison sentence which he served in the Licking County Jail, the Corrections Reception Center, Madison Correctional Institution, and

Chillicothe Correctional Institution. He stated that he did not receive any disciplinary infractions while he was incarcerated. Mr. ▮ said that he participated in the SORRC Program but was not given the opportunity to participate in a sex offender treatment program. He said he never refused to engage in treatment but was not offered the option of sex offender treatment because he was designated to be a low risk offender. Mr. ▮ is currently serving five years of post release control under the supervision of Mr. James Haas, parole officer. Mr. ▮ is currently required to wear a GPS monitor, although he was not placed on the monitor for the first month he was released from prison. He was initially not permitted to have any contact with his children, including telephone contact. Mr. ▮ stated he was not required to engage in outpatient sex offender treatment when he was first released from prison. After he filed a lawsuit against the Adult Parole Authority he was informed that he was now required to engage in sex offender treatment. Mr. ▮ is required to register as a sexually oriented offender.

Mr. ▮ presented as a clean cut, polite, cooperative male who was dressed in a plaid shirt, jeans, and sneakers and was wearing a GPS unit on his left ankle. He was clean-shaven and was wearing a watch and wedding ring on his left hand. Mr. ▮ does not have any tattoos or body piercing.

### Prior Criminal Record:

Mr. ▮ does not have a prior juvenile criminal record. His adult criminal record consists of the instant offense.

### Medical History:

Mr. ▮ said he does not suffer from any medical problems and is not currently taking any medication.

### Psychiatric History:

Mr. ▮ has never been hospitalized for psychiatric problems and has never engaged in outpatient mental health or substance abuse treatment.

### Family History:

Mr. ▮ currently resides by himself in a house owned by a childhood friend. Mr. ▮'s father is sixty-nine years old, and is a retired pastor from the church where his son committed the sex offense. His father is currently a part time pastor at another church. Mr. ▮'s mother is sixty-six years old and retired from a job as an office manager. Mr. ▮'s parents reside in the same home as his wife and children. He had one sister who died at twenty-two years old in a car accident. Mr. ▮'s parents have only been married to each other. There is no family history of criminal behavior, substance abuse, or psychiatric treatment. Mr. ▮ said that he has never been abused. He reports a close relationship with both of his parents.

Mr. ▮ said he was born in Franklin County and grew-up in ▮ He moved to Licking County in 2002 to be closer to his father's church. Mr. ▮'s parents moved in with the couple in 2004 due to his father's health problems. He said that his father was on dialysis at the time, his parents were overwhelmed by medical debt, and the couple wanted to help his parents out.

Mr. ▮ was almost twenty-one years old and his wife was the same age when the couple married. They started dating when they were juniors in high school and attended Ohio State University together. The couple has four children; three sons and one daughter who are currently seventeen (son), almost sixteen (daughter), and fourteen and nine years old (both sons). His wife is employed as the director of a child care center in ▮ Ohio. Ms. ▮ said her husband does not visit her at the day care center and has no contact with the children. She said she is aware of the symptoms of children who have been abused and her children have never exhibited any of those symptoms.

It should be noted that Mr. ▮'s father does not believe that his son committed the instant offense. He told me that he doesn't believe his son molested either of the two children, and that no allegations were ever made against Mr. ▮ prior to the victims coming forward. When asked why some of the members left the church Mr. ▮'s father said it was due to one of the members attempting to gain more power in the church. Although he does not believe that his son is a sex offender, Mr. ▮'s father said he and his wife would do everything to comply with the requirements of the Adult Parole Authority if his son were permitted to move back in with the family. Ms. ▮ also said she would make sure that her husband was never left alone with their children, and would leave the home if other children came to visit.

### Occupational History:

Mr. ▮ is currently employed as an office manager for a roofing and remodeling company. He was released from prison on January 24, 2012, and started working the third week of February. Prior to being incarcerated Mr. ▮ was employed as a data base administrator for the state of Ohio. He held that job for almost five years. Prior to working for Ohio Mr. ▮ was self-employed doing computer consulting and graphic design. Mr. ▮ never served in the military.

Mr. ▮ graduated high school in 1988 and entered the Ohio State University. He spent three and a half years at Ohio State before dropping out due to a lack of funds, and to focus more time on his business. Mr. ▮ got married while he was a student at Ohio State. He completed his college degree in 2001 at ▮ and majored in business administration.

Although police reports listed Mr. ▮ as the youth minister of the ▮ both he and his father said he never served as a youth minister. His father stated that Mr. ▮ was initially working as a worship leader and choir director, both volunteer positions. While there were minors in the choir, there were also adults, and Mr. ▮ was never alone with the children. After Mr. ▮'s father's health started to deteriorate, Mr. ▮ was given the job of associate pastor, so that he could preach in his father's place. That position as well was a volunteer position.

### Client's Version of the Offense:

Upon advice of his attorney, while perjury charges were pending, Mr. ▮ was told not to discuss the instant offense.

### Mental Status Exam:

Mr. ▮ is oriented to time, place, person, and situation ("to be assessed, to determine whether I'm a risk to my family or not"). He described his mood as "sorry". He denied feeling depressed, although his affect was teary off and on during the interview, and he described his mood as being

"good, hopeful." He denied experiencing symptoms of anxiety. Mr. ▮ does not experience crying spells, or suicidal ideation and said that he never made a suicide attempt. Mr. ▮ denied experiencing symptoms of homicidal ideation, paranoid ideation, auditory or visual hallucinations, ideas of reference, mania, panic attacks, phobias, obsessive-compulsive disorder, outbursts of violence, or self-mutilation. There is no evidence of loose associations or flight of ideas. Mr. ▮ said his ability to concentrate is good and described his memory as being "pretty good". He does not experience difficulty falling asleep or staying asleep. An average night of sleep consists of six to seven hours and he does not complain of feeling lethargic. Mr. ▮ said his appetite is "decent" and he has not experienced any recent weight change. He is five feet seven inches tall and weighs about one hundred fifty-five pounds. His hobbies include playing the piano and playing trumpet and singing. Mr. ▮ attends the ▮ on Sunday mornings. Mr. ▮ said his parole officer will not permit him to attend church more often than once a week on Sunday mornings. He said the entire church board is aware of his offense.

Mr. ▮'s ability for abstract reasoning is good. When asked the similarity between an apple and an orange, he said they are both fruit. When asked to explain the proverb, "No use crying over spilt milk"", He stated, don't get upset about things that you can't change." Mr. ▮'s fund of knowledge is also good. He was able to identify the current president, the previous president, and the vice president of the United States.

Mr. ▮'s lack of symptoms are unusual given that he was just released from prison after seven years of incarceration, he is a registered sex offender, he is being sued by the victims, he is not being permitted to live with his family, he is facing felony charges, and he is required to wear a GPS unit. It is not clear why Mr. ▮ felt compelled to deny or minimize any symptoms he may be experiencing, however, it is common for individuals who have been incarcerated to be distrustful of anyone of authority, or anyone they believe to be part of the "system," and he probably did not want to say anything that he thought could jeopardize his ability to live with his children. It is not surprising that Mr. ▮ would be cautious about what he said during the interview given that he is facing fifteen years in prison for perjury.

### Sexual History:

Mr. ▮ said he is currently sexually active with his wife. Mr. ▮'s first sexual experience was when he was seventeen years old and his partner was the same age. His only sexual partner has been his wife. He denies any history of committing voyeurism, exhibitionism, committing frottage, bestiality, committing rape or date rape, sex with juveniles (other than his wife who was the same age), downloading pornography (but has looked at pornography sites), obscene phone calls, trading drugs or alcohol for sex, sex with intoxicated or sleeping partners, sex with men, three way or group sex, engaging in bondage, sadistic or masochistic sex, choking his partners during orgasm, telephone sex, cross dressing, or paying for sex. Mr. ▮ denied going to strip clubs and has never had contact with the group NAMBLA (North American Man Boy Love Association). Mr. ▮ said that he never purchased pornographic magazines or movies He doesn't currently own any pornography and never attended nudist colonies. He viewed pornography on the Internet approximately a dozen times and said he never viewed sites with child pornography.

### Substance Abuse History:

Mr. ▮ said he drinks one cup of coffee and a can of pop a day. He does not smoke cigarettes.
Mr. ▮ said his last drink of alcohol was "maybe a toast for a wedding, maybe fifteen years

ago." He stated that he never abused illegal or prescription drugs and does not have a history of gambling.

### DSM -IV Diagnosis:

| | |
|---|---|
| Axis I: | 302.9 Sexual disorder, Not otherwise specified<br>R/O Hebephilia |
| Axis II | V71.09 None |
| Axis III: | None |
| Axis IV: | problems related to interaction with the legal system, problems related to primary support system |
| Axis V: | GAF 60 |

There are three diagnostic criteria that an individual must meet in order to be diagnosed as a pedophile. The individual must engage in intense sexually arousing fantasies, sexual urges, or behaviors, involving sexual activity with prepubescent children, for a period of over six months. The person must have acted on those urges, or the fantasies cause marked distress or interpersonal difficulty. The individual must be at least sixteen years old and at least five years older than the victims. Since neither of Mr. ██████'s victims were prepubescent he does not meet any of the criteria for the diagnosis of pedophilia other than that he was more than five years older than his victims. Mr. ██████ might meet the criteria for the diagnosis of hebephilia, that is a sexual attraction to pubescent adolescents, usually thirteen or fourteen years old. The diagnosis of hebephila is not an official diagnosis listed in the DSM-IV-TR the Diagnostic and Statistical Manuel of Mental Disorders that is currently in use. A new diagnostic manual is scheduled to come out in May 2013, which has proposed adding the diagnosis of pedophilia/hebephila. If either of Mr. ██████'s victims were thirteen or fourteen years old, he offended them for a period of at least six months, and he has a sexual preference for that age group, he would meet the diagnostic criteria for pedophilia/hebephilia, non exclusive type.

Mr. ██████ does not exhibit any evidence of suffering from an axis II disorder or a personality disorder. Individuals suffering from a personality disorder exhibit a wide range of maladaptive behaviors that effect their ability to function in relationships, including intimate relationships, employment, and in social situations. These traits are usually evident by the time an individual reaches young adulthood. Mr. ██████ has been in a long term relationship with his wife, has held long term jobs, is a committed father and husband, and appears to have many friends.

It should be noted that the diagnosis given, sexual disorder not otherwise specified, assumes that Mr. ██████ committed the instant offense. If Mr. ██████ never committed a sex offence then he would not meet the diagnostic criteria for a sexual disorder. Sexual disorder, Not otherwise specified also is valid for those offenders who have a sexual preference for age appropriate partners, but due to some type of trauma or stress, will temporarily engage in sexual contact with under age partners. The majority of sex offenders who offend against children are what is also referred to as situational offenders, or have normal sexual arousal patterns.

### Prediction of Dangerousness:

To assess the potential risk that Mr. ▮ poses for committing a sex offense in the future, he was scored on instruments that measure the likelihood that an individual will be convicted of another sex offense, within a specific period of time. These instruments were the Static-99 and the Stable 2007. These instruments predict recidivism by comparing an individual to similar populations who were returned to prison for sexual recidivism. Therefore, the instruments can only measure re-conviction rates, and not the actual rates of sexual recidivism. If Mr. ▮ did not commit the instant offense then these scores are not valid. Since we know that sex offenders are not arrested and convicted of every sex offense they commit, the risk of sexual recidivism is higher than the instruments reflect. The instruments also follow sex offenders over a specific period of time, typically anywhere from five to fifteen years, and not over the lifetime of the individual. Therefore, since some sex offenders continue to offend beyond the period of time the instruments measure, actual lifetime recidivism rates are probably higher.

Mr. ▮ received a score of one on the Static 99, on a scale of 0-12, although no one scores a 12 on this instrument. This score puts him in the low risk range to commit another sexual or violent offense. His risk of being convicted of another sex offense ranges 10.3 to 15.8 percent over a period of five to ten years. Mr. ▮'s only risk factor is that his victims were unrelated to him. Again, this score assumes that Mr. ▮ committed the instant offense.

Mr. ▮ was scored on the STABLE 2007, which uses dynamic risk factors to assess the likelihood of an individual's risk to re-offend. Unlike the static risk assessment instruments, where an individual cannot lower his score unless he either ages out of a high-risk age group, or develops a long term, intimate relationship, dynamic risk factors can be changed. These risk factors are based on attitudes and behaviors, such as using sex as a coping mechanism, hostility toward women, deviant sexual preference, and poor cognitive solving skills. The STABLE 2007 is scored on a scale of between zero to twenty-six where twenty-six represents the highest risk to re-offend. Mr. ▮ scored zero on the STABLE 2007 which places him in lowest risk group to re-offend. The interpretive ranges are 0-3 for low risk, 4-11 for moderate risk, and 12 and above for high risk to re-offend. Mr. ▮ was given this score because he showed no evidence of having an impaired capacity for relationships, sexual preoccupation, deviant sexual interests, being impulsive, hostility toward women, impulsivity, deviant sexual preferences, an emotional identification with children, or negative emotionability (outbursts of anger). One area that Mr. ▮ scored well in was his cooperation with supervision. Ms. Manz, unit director of the Columbus 5 region said Mr. ▮ has always been respectful and shows up for all of his appointments. It is likely that Mr. ▮ would have been given a higher score on the STABLE 2007 had he been interviewed during the time he was offending his victims.

### Clinical Impressions and Recommendations:

Mr. ▮ is a forty-one year old, married male, who was convicted of one count of rape and six counts of unlawful sexual conduct with a minor with two female, adolescent victims. Their ages were between thirteen and sixteen years old, and attended they the church where Mr. ▮'s father was the minister. The victims also baby-sat for Mr. ▮'s four children, when his children were between the ages of one through nine years old.

Mr. ▮ possess many of the characteristics of situational or non preferential sex offenders in that he has no prior criminal record, comes from a stable home, is involved in a long term, intimate

relationship, is a committed father, and has a history of stable employment. Frequently these offenders marry young, and have limited dating experience. In Mr. ▇▇▇'s case, he started dating his wife when he was seventeen years old, got married when he was in college, dropped out of college, and had four children in eight years. He volunteered in his father's church and enjoyed the attention and admiration that he received from female adolescents. Often these men, and sometimes women will feel that they missed something by jumping into a serious relationship so young, a condition often referred to as a "middle aged crisis." Mr. ▇▇▇ has other similarities with most sex offenders in that he "groomed" his victims, and told them that he loved them. Grooming is something sex offenders do to gain their victims' trust. As a volunteer in his father's church, Mr. ▇▇▇ was probably respected and trusted by most of the church members, who would not have been concerned to see him with their children. Relatively few sex offenders commit their offenses against strangers, and those that do tend to have a high risk of recidivism.

As stated above, situational sex offenders are most likely to offend when they are experiencing some kind of trauma and have the opportunity to groom potential victims. In Mr. ▇▇▇'s case, since he denied committing the sex offense, it is not clear what the factors were that contributed to him committing an offense, but he has experienced what might at best be referred to as challenges in his life. The sudden death of his sister at twenty-two years old would have been very difficult to deal with. Other stresses would have been the severe health problems of his father, who told me he spent weeks in the hospital after his kidneys shut down and the decision to invite his parents to move into his home. The break up of Mr. ▇▇▇'s father's church and accusations of financial misconduct was also likely to have taken a toll.

It is my understanding that Mr. ▇▇▇ is requesting to live with his wife, his parents, and the couple's four children, including his almost sixteen-year old daughter. At the present time he is temporarily living in the home of a friend, but that home will not be available much longer since his friend intends to sell it. If Mr. ▇▇▇ loses that home his options for housing become very limited. He does not have another relative that he can move in with since his sister is deceased and his parents live with his wife and children. There isn't a shelter in the state of Ohio that accepts sex offenders, and there are many sex offenders who are sleeping under bridges or in their cars, because it is hard to find a landlord who will rent to sex offenders. If the Adult Parole Authority finds it difficult to monitor Mr. ▇▇▇'s whereabouts now, since the GPS unit seems to go off for no apparent reason, they will find it next to impossible to monitor him if Mr. ▇▇▇ becomes homeless.

The most important reasons to permit Mr. ▇▇▇ to move in with his family is that his family wants him back in their home, and statistics show that offenders are much less likely to re-offend when they have the support of their families. Ms. ▇▇▇ worked hard to make sure that her husband remained involved with the family during the seven years he was incarcerated. Mr. ▇▇▇ spoke to his children on a daily basis and the children visited twice a month when he was in prison. Since getting out of prison Mr. ▇▇▇ has been barred from having phone contact with his children, has not been permitted to talk to his children when they saw each other in church, has not been permitted to live with his family, and is required to wear a GPS unit. It is understandable that the Department of Rehabilitation and Corrections and the Adult Parole Authority would have concerns about Mr. ▇▇▇ living in the same home as his sixteen-year old daughter, since one of his victims was the same age as his daughter is now. However, that doesn't explain why Mr. ▇▇▇ was not permitted to talk to his children over the telephone, talk to them at church, or have supervised contact with them.

It should be noted that Mr. ███ possesses none of the characteristics associated with high-risk sex offenders. These risks include being under the age of twenty-five years old, having a previous sex offense history, prior criminal behavior, having male victims, stranger victims, non-contact offenses, and a history of violence. The DRC scored Mr. ███ on the Static 99 as well as another risk assessment instrument and on both instruments he was rated as low risk to re-offend. In fact Mr. ███ was not offered the opportunity to engage in sex offender treatment (other than a short term psycho-educational program) because he was deemed to be a low risk offender. It seems contradictory that Mr. ███ is considered too low risk to be required to engage in sex offender treatment, but too high risk to have supervised contact with his children.

Mr. ███'s children were interviewed by Children Protective Services workers and the children denied that he ever sexually assaulted them. His parents and wife are willing to make sure that he is never left unsupervised around his children. His offense was with unrelated children and there is no reason to believe that he would target his own children or that he should not be permitted to live with his family as long as certain restrictions are in place. Just because a sex offender commits an offense against an adolescent does not mean that he is a risk to offend all adolescents. In addition to not being unsupervised around his children, Mr. ███ should also be required to take polygraphs every six to eight months to make sure that he is complying with the terms of his supervision, and that he has not re-offended. The requirement that Mr. ███ take polygraphs will do a better job of monitoring his activities than wearing a GPS unit that misfires and can only show where Mr. ███ has been, but not whether he has re-offended.

It is my understanding that the DRC and the Adult Parole Authority is now requiring Mr. ███ to engage in sex offender treatment before he can be permitted to live with his family. Usually I would agree with the recommendation that Mr. ███ engage in sex offender treatment, with an emphasis on identifying strategies he can utilize when he is confronted with situations that threaten to disrupt his ability to function, such as conflict in his church or other stressful life events. Unfortunately, Mr. ███ is probably not amenable to sex offender treatment at this time. Either he didn't commit the sex offense, in which case he should not be placed in sex offender treatment, or he did commit the offense and he is in denial. Sex offenders who are in denial are notorious for doing poorly in therapy and also for hindering the progress of other group members. The best tool for confronting denial is the use of the polygraph. Unfortunately, Mr. ███ is currently facing perjury charges in regard to the sex offenses, since he requested to change his plea from guilty to not guilty. His attorney is willing to have him take polygraphs with questions about whether he offended his children but has advised him not to answer any questions regarding the sex offense. Any of the statements that Mr. ███ makes either in treatment or during the polygraph could end up being used against him in the perjury trial. Mr. ███ has difficulty trusting anyone associated with the criminal justice system. He is certainly won't be willing to talk about his offense in a group session or during a polygraph if it means those statements will be used by the Licking County Prosecutor's office as evidence that he committed perjury. As long as the threat of being prosecuted for perjury and going back to prison is hanging over Mr. ███'s head, he is unlikely to be able to benefit from sex offender treatment.

It is my belief that Mr. ███ is a low risk offender whose best chance for rehabilitation is to be permitted to live with his family. Sex offenders have the same needs as everyone else. They need to feel loved, productive, appreciated, and respected. The difference is that their self-esteem tends to be lower than other adults, and they tend to have problems in relationships and in dealing with negative emotions such as feelings of anger, guilt, loneliness, and feelings of victimization. Sex offenders face discrimination in employment, housing, and being accepted in the community. Without the support

of his family, and a stable place to live, it will be extremely difficult for Mr. ▮▮▮▮ to lead a productive life. That does not mean that he should be permitted to be around minors without any restrictions. He should not be permitted to be in the home if his children invite their friends to visit, and he should not be left alone with his children, at least until he has passed several polygraphs or his daughter turns eighteen years old. There is no evidence that Mr. ▮▮▮▮'s sons are in his victim pool. The terms of Mr. ▮▮▮▮'s supervision should be targeted to his particular risk factors rather than a generic one size fits all approach.


Respectfully submitted,

*[signature]*

Susan J. Ullman, MSW, LISW-S            March 14th, 2012
Sex offender therapist