**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN DOE**, et al., | : | Case No. 2:12-cv-188 |
| Plaintiffs, | : | Judge Sargus |
| | : | |
| | : | Magistrate Judge Kemp |
| v. | : | |
| | : | |
| **JAMES HAAS**, et al., | : | **PLAINTIFFS' POST-TRIAL BRIEF** |
| | : | |
| Defendants. | : | |

## I.  INTRODUCTION

Defendants' approach to this case has been procedurally flawed and backwards from the start.  Believing Mr. Doe to be a risk to his children, Defendants unilaterally prohibited him from living at home with his wife and minor children, and told him to live under a bridge if he could not find another place to reside.  Defendants did not stop there.  Until Mr. Doe and his wife filed suit in this case, Defendants had forbidden him from communicating with his children in any manner, including by phone, email, and in-person.  It was only after the Does commenced this case that Defendants retreated and agreed to allow Mr. Doe to telephone his children and communicate in person at church.

When Defendants barred Mr. Doe from living at home and having contact with his children, they lacked particularized evidence that he posed a danger to them.  Instead, Defendants rationalized their actions based on speculation that Mr. Doe might possibly offend against his daughter because she is now the same age as his two victims.  Defendants did not give Mr. Doe a hearing before depriving him of his fundamental rights to parent and familial

association; in fact, Defendants concede that the issue of the residence restriction is not administratively grieve-able. *Id*. at 29-30.

Seeking to justify their actions after-the-fact, Defendants introduced evidence at the TRO hearing of GPS curfew violations that allegedly occurred *after* Defendants had already barred Mr. Doe from his home. Defendants argued that these alleged curfew violations showed that Mr. Doe still had work to do to earn their trust before he would be allowed to return home. But Defendants now concede those violations never occurred.

Defendants are wrong to argue that Mr. Doe must first prove he is no longer a danger before he is allowed to return home. Having infringed on Mr. Doe's fundamental right to parent without giving him an opportunity to be heard, it is Defendants that must now demonstrate, with particularized evidence, why it was necessary to ban him from his home. Defendants cannot meet their burden where, as here, they lack specific evidence that Mr. Doe is likely to offend his children. Moreover, the only expert witness who clinically assessed Mr. Doe, concluded that he should be allowed to return home immediately.

## II. STATEMENT OF FACTS

### A. Mr. Doe May be Banned from his Family for the Next Five Years

Defendants banned Mr. Doe from his home because his children are the same age of the victims. *Id*. at 63. Defendant Haas explained that he supervises many sex offenders who are not allowed contact with their own children. *Id*. at 63-64. Several must complete a 26 week program "with the intentions to be able to start the reunification process." *Id*. at 64. Others are going through sex offender programming "with hopes to start the reunification process." *Id*. One sex offender, who is ready to get off supervision, was finally allowed to move home after a lengthy period of "working the system." *Id*. at 63. Several of Defendant Haas' sex offenders

have actually been granted permission to meet with their children.  *Id*. at 64.  It appears that Defendants routinely ban sex offenders from their families for extended periods of time with the "hope" of eventual reunification.  With respect to Mr. Doe, Defendant Haas reiterated that he "hope[s] throughout the five-year period that [Mr. Doe] will be able to get a chance to reunify with his family," *id*. at 64, "[a]nd we're building to see where he's at and where we can get him at, and when we can get him off supervision, be reunited with his family."  *Id*. at 96.

### B.  Mr. Doe Did Not Violate His Curfew

Defendants did not introduce any evidence at the hearing that Mr. Doe had abused his children in the past or was likely to do so in the future.  Instead, in order to support their position, Defendants introduced evidence that Mr. Doe had violated his curfew as determined by his GPS monitor.  Defendants clearly deemed this evidence important, since three of the four defense witnesses who testified stressed the alleged GPS violations as a reason why Mr. Doe should not be allowed to return to his family.

When asked if the alleged curfew violations would cause him concern, Michael Jackson explained: "Absolutely…that would be an enormous red flag that we're having these type of violations at this early stage in supervision.  That's not a good thing at all."  *Id*. at 35.

Defendant Haas expressed even more concern, especially about the alleged violations that suggested Doe was roaming near sheds on a neighbor's property after curfew:

> [T]he concern is with the Gosser family, the youngest daughter has a job that she works. She walks through that yard close to those sheds several nights a week…[H]e was there…So my increased concern is for that young lady who walks through that area. And I'm hoping that they, the family, changes the behavior pattern of her…."

*Id*. at 76. Mr. Haas also spoke of other neighbors in the area who have teenage daughters.

*Id.* at 75.  Moreover, as the following exchange indicates, the alleged GPS violations Defendant

Haas to question Mr. Doe's truthfulness:

> [Defense Counsel]:  Now when you have -- and I know you are still
> investigating these violations, and there hasn't been a determination yet, but
> just from reviewing Plaintiff's Exhibit 5 and these dots outside the
> exclusion zone, does that make you uncomfortable allowing unsupervised
> visits with his children?
>
> [Defendant Haas]: … I don't think the offender and I, the offender and the
> family, the offender's family and I, have had the time to build a relationship
> where there is trust, where there is -- where I can believe the words that are
> being said.

*Id*.  at 77.

For defense expert David Berenson, the alleged GPS violations had "an enormous effect"

on his thinking:

> [W]here there is a lack of cooperation with supervision and supervising
> agents, you're taught that's a red flag that has to be taken into account…It
> could be evidence of active – and I'm not saying it is, but one of the red
> flags that's going to come up for me is that could be evidence that there is
> active planning of sexually assaultive behavior. And I don't mean planning
> of a specific sexual assault but the mental constructs of committing
> offenses…. So when you start to see behavioral indicators that even any
> type of passive planning could be going on, you would have to be very
> serious about what you are dealing with.

*Id*. at 159-160.

Defendants' alleged curfew violations put Mr. Doe in the difficult position of having to

prove that the GPS monitoring system had somehow malfunctioned.  To that end, Mrs. Doe

testified that she was present on two occasions when the GPS monitor had alerted when Mr. Doe

was inside the home.  During the first of those occurrences, Mrs. Doe arrived at the home some

seven minutes after receiving a call from Mr. Doe that his monitor had alerted.  *Id*. at 101, 108.

When she arrived, the alarm was still sounding.  *Id*. at 101.  During the second occurrence, Mrs.

Doe was with her husband when the monitor went off.  *Id*. at 99-100.   But taking the position of

"devil's advocate," the Court appears to have credited the GPS evidence and to have discounted

Mrs. Doe's testimony:  "It wouldn't be difficult to place a phone call after this [GPS] alerted, and

then seven minutes later someone arrives, and you're no longer in the offending location."  *Id.* at

168.

But the GPS evidence turned out to be false.  After conducting further investigation,

Defendants have concluded that the alleged GPS violations "were in fact anomalies" and that

"Mr. Doe was not in violation of his curfew."  (Doc. 26).

### C.  Defendants Rely on Clinical Expertise to Determine Family Reunification.

None of Defendants' witnesses had clinically assessed Mr. Doe to determine his

likelihood of re-offending against his daughter should he be allowed to return home.  Only one

of the witnesses who testified for the defense – Defendant Haas – had even met Mr. Doe.

(Mausser Testimony, Tr. 21-22 (acknowledging she had never met Mr. Doe); Jackson

Testimony, Tr. 37 (same); Berenson Testimony, Tr. 165 (same)).  But two of those witnesses,

Mausser and Jackson, emphasized the importance of clinically assessing Mr. Doe to determine

whether he could safely return home.

Ms. Mausser is the chair of Ohio's Parole Board, which imposes supervision conditions

for offenders on post-release control.  *Id.* at 13.  She did not conduct the actual supervision of

Mr. Doe, nor is she a sex offender specialist.  *Id.* at 20.  Ms. Mausser stressed the importance of

clinically assessing sex offenders to determine how they will be managed in the community:

"We recommend an assessment for counseling, and we permit the folks who are – the sex

offender specialists make that determination."  *Id.*  She added that her staff will direct an

offender to a specialist to have a recommendation about programming made, "[s]o there isn't any

confusion whether or not we are actually mandating programming on somebody who doesn't require it...." *Id.* at 21.

With respect to the specific question of whether Mr. Doe should be allowed to return home immediately, Mr. Jackson stated: "If there was a clinician agreeing to the process of his reintegration back into the home that would be something we would rely on, that clinician's expertise to deal with that." *Id.* at 32.

### D.  Expert Susan Ullman Recommends Immediate Family Reunification.

Although Defendants did not present testimony from any expert who had clinically assessed Mr. Doe, Plaintiffs called Susan Ullman, an expert in the area of sex offending and sex offender risk assessments.  Ms. Ullman concluded that based upon her expertise and clinical assessment, Mr. Doe should be allowed to reunite with his family immediately.

Ms. Ullman obtained her master's degree in social work from the University of Pennsylvania.  *Id.* at 111.  A licensed therapist, Ms. Ullman works at LifePoint Solutions, where she primarily counsels sex offenders.  *Id.*  As part of her work with LifePoint, Ms. Ullman provides diagnostic assessments and sex offender treatment for individuals on federal probation in Cincinnati, Ohio, *id.* at 112, and also has prepared reports for the Adult Parole Authority.  *Id.* at 113.  Additionally, she has testified as an expert in two other federal court proceedings, one before Judge Dlott, the other before Judge Rice.  *Id.* at 112.  In all, Ms. Ullman estimated that she has prepared at least 500 diagnostics reports concerning sex offenders.  *Id.* at 113.

Ms. Ullman clinically assessed Mr. Doe before the TRO hearing.  *Id.* at 115.  Based on that assessment, she determined that "Mr. Doe is a low-risk to re-offend."  *Id.* at 117.  Regarding the basis of her opinion, Ms. Ullman explained:

> The type of offense it is, the support he receives from his family, his age, he
> just doesn't have most of the factors of sex offenders who are likely to re-

> offend.  He doesn't have a history of substance abuse.  He has been a stable
> family man.  He has held a job.  He doesn't have a history of criminal
> behavior.  He doesn't have a history of violence.  So all of those factors go
> into the evaluation.

*Id.*

Ms. Ullman testified multiple times that she believes Mr. Doe should go home immediately.  During Ms. Ullman's direct examination, Plaintiffs' counsel asked:  "What are your recommendations about living at home, about Mr. Doe living at home with his children, his family?"  *Id*. at 124.  Ms. Ullman responded, "Again, I believe that he should at least initially have supervision whenever he is around the children.  I also believe he should be out of the home or other children should not be permitted to visit the home while Mr. Doe is in the home.  I believe he should take polygraphs every six-to-eight months."  *Id.*

During cross examination, Ms. Ullman reiterated that Mr. Doe should be reunited with his family immediately.  At one point, Mr. Calhoun stated, "Now you testified that you would like to see him back in the family home," to which Ms. Ullman replied, "That's correct."  *Id*. at 141.  Ms. Ullman then explained that Mr. Doe's wife and parents should monitor him inside the home when the children are present.  *Id*.

And on redirect, Plaintiffs' counsel, referring to the fact that Mr. Doe is in a "holding pattern" with treatment because of his pending perjury charges, asked:  "Are you suggesting that he should not go home until his perjury case is resolved?"  *Id.* at 142.  Ms. Ullman responded: "No, that's not my suggestion.  My suggestion is he should go home because I don't know how long it's going to take to resolve [the perjury] case.  I don't know what the future holds for him, and right now he very much needs the support of his family, and I understand his children very much want him in the home."  *Id.* at 142-143.

Although, Ms. Ullman was clear during direct, cross and redirect that Mr. Doe should be allowed to return home immediately, confusion arose during the following exchange between the Court and Ms. Ullman:

> THE COURT:  * * * If you were to tell me your opinion of what you would recommend, and we didn't have the perjury charge looming as an impediment, I assume from your testimony you would say you would want him to enroll in some type of counseling or treatment program?
>
> THE WITNESS:  I would.
>
> THE COURT:  Supervision visitation to start, pretty much immediately[?]
>
> THE WITNESS: That's correct.
>
> THE COURT:  The family reunification in a residence would depend on those first two steps moving along and, as the probation officer said, some trust being established?
>
> THE WITNESS:  That's correct.

*Id.* at 143-144.  Later during the hearing, the Court indicated it construed Ms. Ullman's answers to its questions as favoring a "gradual process" of reunifying Mr. Doe with his family.  *Id.* at 169-170.

However, Ms. Ullman cleared up the confusion in her supplemental declaration.  As that declaration indicates, Ms. Ullman does not recommend a "gradual process" of returning Mr. Doe to his home but instead recommends that he be allowed to live with his family immediately. (Ullman Supp. Decl. at ¶10).  With respect to her answers to the Court's questions, Ms. Ullman said:

> I did not mean to suggest to the court, as my answers in response to its questions imply, that Mr. Doe should return home only after he enrolls in treatment and begins supervised visitation outside of the home.  When I answered the court's questions I was focused on what would be an ideal progression towards family reunification in a generic case involving an offender who had been convicted of sexually assaulting an unrelated minor and sought to live at home with his under aged children.  But that ideal

> progression in a generic case cannot apply here because Mr. Doe is not able
> to enroll in treatment at this time.

*Id.*

In sum, Ms. Ullman is confident that Mr. Doe can safely return home if he is supervised around his children by the other adults in the home and if he is periodically polygraphed. (Tr. 124). With respect to polygraphs, Ms. Ullman noted that Mr. Doe had already taken one during which he was asked whether he had ever sexually abused his children or was sexually aroused by them, *id.* at 118, that he answered no, *id.*, and that he passed.[1] (Supplemental Declaration of Susan Ullman at ¶11, attached as Exhibit 1 to Doc. 27). Ms. Ullman also explained that polygraphs are commonly used to treat and manage sex offenders: "The only way we know if sex offenders are following the rules and conditions of their supervision is by taking polygraphs." (Tr. 114).

According to Ms. Ullman, polygraphing Mr. Doe every six to eight months would serve the dual purposes of verifying that he had not abused his daughter or any other minors in the home and deterring him from committing new offenses. With respect to deterrence, Ms. Ullman explained: "If [sex offenders] know that a behavior is going to come out when they are asked on a polygraph, it has a huge deterrent effect. *Id.* at 114.[2]

Finally, although initially concerned by the allegations that Mr. Doe had violated his curfew, *id.* at 122, Ms. Ullman's confidence in her recommendation increased after learning that

---

[1] Mr. Doe was also tested about the alleged GPS violations. Ms. Ullman explained that "[Mr. Doe] said that he did not deliberately violate curfew hours. He said no, and the polygraph said that he was telling the truth." (Tr. 123).

[2] Defense witness Michael Jackson also acknowledged the applicability of periodic polygraph testing as a deterrent. (Tr. 40).

Mr. Doe had not violated his curfew as the state had alleged at the hearing.  (Ullman Supp. Decl. at ¶11).

### E.  Mr. Doe May Be Forced to Live Under a Bridge If He Loses His Current Housing.

Mr. Doe currently lives in a house that is going to be put up for sale.  (Tr. 121).  If Mr. Doe becomes homeless before family reunification occurs, he may be forced to live under a bridge.  Defendant Haas described the "homeless bridge" during his testimony:

> The homeless bridge is down beside the post office, and it's relatively very close to the sheriff's department. And Greg Collins was the ESORN officer when I came to Licking County. And I don't know how it started or if it started before I got there or it started when I got there, I'm not quite sure on it, but Greg Collins, he was the ESORN officer, and he would use that. We began using that. And then Greg took a promotion, and now it's Corey Love is the ESORN officer, and he currently uses that. And it's unfortunate, but it's the – it's what we have in Licking County.

> \*       \*       \*

> \* \* \* And it's a very wide bridge, and there's area down there to park a car. There's areas where we have had guys set up tents. We've had guys actually set up underneath the girders on many -- You know how the cement goes up, and then the steel beams sit on it. We've had guys set up down there.

*Id.* at 55-56.

Ms. Ullman's recommendation that Mr. Doe be allowed to live with his family immediately is based, in part, on her concerns about him living in an unstable environment.  She explained:

> Right now he's living by himself in a house that's going to be put up for sale.  So it's an unstable place where he's living.  If he loses that option, the options for Mr. Doe become very limited. It is difficult to find housing for sex offenders, particularly long-term housing, and the problem will become rehabilitation.  He's not going to be able to participate in the family activities.  It's going to be difficult for him to find a job when he's got unstable housing. So those are the issues that come into play.

*Id.* at 121.

Even defense witnesses Michael Jackson and Defendant Haas expressed concern at the prospect of an offender's being homeless. *Id.* at 38, 56.  Mr. Jackson also agreed that homelessness could be a risk factor for re-offending.  *Id.* at 38.

### III. ARGUMENT

Plaintiffs will not repeat the arguments they have already made in earlier pleadings.  In addition to incorporating those arguments here, Plaintiffs make the following additional points.

#### A.  Defendants Could Have Avoided a Procedural Due Process Violation By Seeking the Intervention of Juvenile Court.

As opposing counsel conceded at the hearing, the decision to ban Mr. Doe from his home was made at "the sole discretion of the Adult Parole Authority with no judicial oversight. *Id.* at 8.  The procedural necessity of judicial oversight is especially important in cases like Mr. Doe's, where parental rights are at stake.  Indeed, some commentators and courts have referred to the termination of parental rights as the "civil death penalty."  *See e.g.,* Barbara Glesner Fines, *Challenges of Representing Adolescent Parents in Child Welfare Proceedings*, 36 U. Dayton L. Rev. 307, 317 (2011); Elizabeth Mills Viney, *The Right to Counsel in Parental-Rights Termination Cases:  How a Clear and Consistent Legal Standard Would Better Protect Indigent Families*, 63 SMU L. Rev. 1403, 1406 (2010); *In re K.A.W.*, 133 S.W.3d 1, 12 (Mo. 2004); *Drury v. Lang*, 776 P.2d 843, 845 (Nev. 1989).

To be fair, Defendants did not seek to terminate Mr. Doe's parental rights. However, banning Mr. Doe from living with his family and from having any contact with his children, as Defendants initially did before allowing some communication, implicates the same rights at stake in parental termination cases.

Defendants insist that the condition banning Mr. Doe from his home is reasonable to protect the public and promote his rehabilitation.  (Tr. 17).  But, there is no statute or regulation that allows them to deprive Mr. Doe of his fundamental rights to parent and familial associations.  Accordingly, Defendants should have sought the intervention of Juvenile Court by filing a complaint under R.C.  2151.27(A) and requesting a hearing.  They could have reported their concerns to Licking County Department of Jobs and Family Services ("JFS") under R.C. 2151.421(B) if they had sufficient facts to suspect that a child had suffered or faces a threat of suffering abuse or neglect.  All complaints to JFS must be investigated within twenty-four hours.  R.C. 2151.421(F)(1).  JFS would then complete a safety and family assessment.  OAC 5101:2-37-01, 03.  If JFS believes the child is at risk, then JFS must file a complaint in the juvenile court and request a hearing.  OAC 5101:2-39-01(D).  If the court determines state intervention is warranted, JFS would be required to develop a case plan to reunite the family and seek court approval of the plan.  R.C. 2151.42, R.C. 5153.16(A)(18), OAC 5101:2-38-05.  The reunification assessment requires JFS to interview the family and identify any necessary interventions to support reunification, and JFS and the court would monitor completion of the plan. OAC 5101:2-37-04(B), R.C. 2151.42, OAC 5101:2-38-05.

All of these procedures ensure due process by requiring the complainant to prove to the court that the parent poses a specific threat to the child before any actions are taken.  If the court finds a child is at risk, JFS must propose a reunification plan that meets the court's approval.

Instead of following this statutory process, Defendants chose to interfere on their own, without judicial oversight, and infringe Mr. Doe's fundamental parental rights.  Defendants could have filed a complaint or asked JFS to investigate Mr. Doe before he was released from

prison.  Instead, Defendants unilaterally barred Mr. Doe from living with his children without providing sufficient facts to the juvenile court showing that he is a danger to them.

Ironically, JFS investigated Mr. Doe prior to his release and concluded that Mr. Doe was not a risk to his daughter, and that the anonymous allegation that he abused his daughter was false. (Jane Doe Decl. at ¶19).  Despite JFS's conclusions, Defendants acted unilaterally without any concrete evidence that Mr. Doe posed a specific threat to his children. In sum, Defendants deprived Mr. Doe of his parental rights on a hunch that he might pose a risk to his children.

Defendants now claim that Mr. Doe must prove he is not a danger before allowing him back in the home.  Equally disturbing is the Defendants' "reunification plan" that is based solely on a "hope throughout the five-year period that [Mr. Doe] will be able to get a chance to reunify with his family." (Tr. 64).  Defendants did not initially identify any specific actions that Mr. Doe could take to reunite with his family. After this suit was filed, Defendants decided that "[i]f Mr. Doe agreed to participate in a sex offender program, he would be able to begin the process of establishing supervised visits with his children."  (Defendants' Memorandum in Opposition to Plaintiffs' Motion for Temporary Restraining Order, Doc. 12, at 10).  Defendants also offer the hollow reassurance that "[s]upervised visitation may not last during the entire pendency of Mr. Doe's PRC."  *Id*. at 2.

There is absolutely nothing to prevent Defendants from banning Mr. Doe from his home for the next five years.  This is procedurally flawed and wrong in violation due process.

### B.  Defendants' Violation of Mr. Doe's Fundamental Rights Is Not Narrowly Tailored in Light of the Evidence Introduced at the Hearing.

Defendants barred Mr. Doe from living with his family based solely on the fact that Mr. Doe's victims were unrelated minors.  (Tr. at 16-17, 30).  Defendants offered no concrete evidence that Mr. Doe posed a risk to his children. Instead, Defendant's expert opined that

banning him from his home makes "human sense" *id.* at 156, despite the fact that he had never met Mr. Doe or his family.

The only particularized evidence that Defendants relied on to justify banning Mr. Doe from his home were the alleged GPS curfew violations that occurred after the no contact order was imposed.  Now that Defendants have acknowledged that Mr. Doe did not violate his curfew, and all of the alleged violations were actually GPS anomalies, Defendants failed to show that banning Mr. Doe from his family home is narrowly tailored to advance his rehabilitation and protect the public.

More importantly, the only sex offender expert who assessed Mr. Doe testified that Mr. Doe should be allowed to live with his family if his wife and parents supervise his contact with his children, and he continues to take polygraphs.  Susan Ullman's unrefuted testimony was that allowing Mr. Doe to return home immediately would promote his rehabilitation.  To ensure that Mr. Doe does not pose a risk to the public, Ms. Ullman recommended that Mr. Doe not have contact with unrelated minors.

In addition to her clinical recommendation, Ms. Ullman offered evidence that Mr. Doe is not a risk to his children.  Specifically, Ms. Ullman relied on Mr. Doe's polygraph results[3] to confirm that Mr. Doe has not sexually abused his children and is not sexually aroused by them. Although polygraph results are generally inadmissible, courts routinely rely on them for sentencing purposes and to monitor a defendant's rehabilitation and ensure compliance with probation conditions.  *See e.g. United States v. Wilson*, No. 98-5373, 1998 WL 939987, *2, *3 (6th Cir. Dec. 22, 1998) (concluding that a polygraph meets the probable accuracy test and is a

---

[3] As Ms. Ullman explained, Mr. Doe was given a specific issue polygraph which is more expensive, more time-consuming, and more accurate than a maintenance polygraph. Tr. at 118-119.

valid tool to monitor rehabilitation and compliance with release conditions) (attached as Exhibit 1).  Moreover, Mr. Doe's polygraph result that he had not violated his curfew has now been shown to be accurate.

Defendants should rely on Ms. Ullman's expertise and allow Mr. Doe to return home immediately.  Ms. Ullman's recommendations are narrowly tailored to promote Mr. Doe's rehabilitation and protect the public, and they should be implemented immediately.

**IV. Conclusion**

Nearly three months have passed since Mr. Doe's release from prison.  For that entire time, Defendants in their "sole discretion" have banned him from living with his family. And until March 1, 2012, when Plaintiffs filed suit, Defendants prohibited Mr. Doe from having any contact with his children.

Defendants claim this ban is narrowly tailored to keep Mr. Doe from re-offending against teenage girls. Yet Defendants allow him to live in a home alone, surrounded by neighbors with teenage girls. According to Susan Ullman, Defendants may be undermining their goal of community safety by isolating Mr. Doe from his family and potentially subjecting him to homelessness should the house be sold.

In light of the evidence at the hearing, this Court should follow Ms. Ullman's recommendation and order Defendants to allow Mr. Doe to reunite with his family immediately.

Respectfully submitted,

/s/ David A. Singleton
David A. Singleton, #007456
Trial Attorney
Margie Slagle, #0082217
Deana Taylor
James Charles Kinsman
Alex Havlin
Co-Counsel

Ohio Justice & Policy Center
215 East Ninth Street, Suite 601
Cincinnati, Ohio 45202
(513) 421-1108 ext. 17
dsingleton@ohiojpc.org
mslagle@ohiojpc.org
taylord7@mymail.nku.edu
kinsmanc1@mymail.nku.edu
havlina1@mymail.nku.edu

## CERTIFICATE OF SERVICE

I certify that on April 11, 2012, a copy of the foregoing Plaintiffs' Post-Trial Brief was filed electronically. Notice of this filing will be sent to all parties by operation of the court's electronic filing system.

/s/ David A. Singleton
David A. Singleton

\* Authorized to assist in the representation of Plaintiffs pursuant to S.D. Ohio Civ. R. 83.6.